RENDERED:  MAY 1, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0424-ME

ANGELA SEXTON                                                         APPELLANT


v.        APPEAL FROM NICHOLAS CIRCUIT COURT
          HONORABLE HEATHER FRYMAN, JUDGE
          ACTION NO. 24-D-00030-001


JEFFREY EDWARD DUNN                                                    APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, EASTON, AND L. JONES, JUDGES.

ACREE, JUDGE:  Appellant Angela Sexton appeals an interpersonal protective

order entered against her in the Nicholas Family Court.  We affirm.

## BACKGROUND

Appellee Jeffrey Dunn requested an emergency order of protection

against his former girlfriend, Appellant Angela Sexton, on December 12, 2024.  In

the petition, he described a pattern of concerning behavior on Angela's part.  He

recounted that Angela, purportedly jealous of Jeffrey's new girlfriend and the fact

that she was carrying Jeffrey's child, faked a pregnancy for nine months and led Jeffrey to believe it was his child. She went to significant lengths to maintain this story, including but not limited to purchasing a fake pregnancy belly, asking Jeffrey for money to support the child, and hosting a gender-reveal party.

Angela's adult daughter informed Jeffrey that Angela was never pregnant and her theatrics were born from jealousy. When confronted, Angela denied faking the pregnancy but declined to provide any further information to Jeffrey.

The day after Jeffrey's girlfriend gave birth, Angela called Jeffrey and falsified a story about being life-flighted to a hospital in Cincinnati where she gave birth to the child. She claimed to have named the baby after Jeffrey's father, which upset Jeffrey since he always wanted to have a son named after his father. Angela continued the charade, telling him their baby was not healthy and passed away at birth. A skeptical Jeffrey asked Angela to send photographs as proof.

Angela sent him a photo of a healthy baby and a photo of herself in front of Cincinnati Children's Hospital, both of which appeared to be poorly photoshopped. Jeffrey conducted a reverse image search and was able to locate both images online: the photo of the baby was found on a stock image site and the photo of the hospital was available on the hospital's website.

She also made a social media post about scattering the child's ashes and publicly berated Jeffrey for not attending a "service" for the child. Individuals speculated that the ashes came from a grill.

Jeffrey wished to know whether he had actually fathered a child with Angela and sought assistance from the local county attorney. At the hearing, the county attorney testified that there was no record of any child born to Angela in the Kentucky and Ohio birth and death records.

Even after the alleged pregnancy came to an end, Angela continued to call Jeffrey, his new girlfriend, and others for a period of over two years. She followed them at public events, allegedly attempted to entice Jeffrey's young children off a carnival ride at a fair, chased Jeffrey in town with a vehicle, and repeatedly drove past his residence while screaming and honking her horn. She also contacted Jeffrey's employers in an attempt to sabotage his employment.

Various text messages from Angela were admitted into evidence. The texts were sent from various phone numbers which Angela admitted to creating. Particularly concerning is a screenshot of a text to Jeffrey's girlfriend wherein Angela admits to "pull[ing] up on him in Feb 2023." (Pl. Ex. 1).

Jeffrey testified the culmination of Angela's behavior causes him worry because he cannot predict what Angela might be capable of doing, considering her bizarre pattern of behavior. He noted concern about allowing his

children to play in the yard, Angela following his family in public, and Angela causing a wreck while following his family in her vehicle.

Angela admitted to most of the aforementioned behavior at the hearing. She did, however, deny faking the pregnancy. She also claimed the audible screaming heard on the video footage of Angela driving past Jeffrey's home was actually Jeffrey's girlfriend, though the sound seems to emanate from the vehicle. She continued to assert she needed closure from Jeffrey and admitted to having an emotional outburst when she learned Jeffrey's girlfriend was pregnant. Angela also claimed she is now dating Jeffrey's identical twin brother.

The family court entered a protective order at the end of the hearing. The court was uncertain whether it ought to be styled as a domestic violence order or an interpersonal protective order, noting the parties once lived together but have since ceased any relationship. Later, on Angela's Motion to Alter, Amend, or Vacate, the court clarified that the order is an interpersonal protective order and affirmed its prior rulings. Angela now appeals.

## ANALYSIS

Jeffrey did not file an appellee brief. Kentucky Rule of Appellate Procedure ("RAP") 31(H)(3) provides:

> If the appellee's brief has not been filed within the time allowed, the court may: (a) accept the appellant's statement of the facts and issues as correct; (b) reverse the judgment if appellant's brief reasonably appears to sustain

such action; or (c) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

However, this Court may decline to exercise any of the options provided for in RAP 31(H)(3). *Strong v. Gary*, 673 S.W.3d 77, 79 (Ky. App. 2023) (citing *Roberts v. Bucci*, 218 S.W.3d 395, 296 (Ky. App. 2007)). We find none of the options appropriate here and proceed with our review.

We review a family court's issuance of an IPO to determine "whether the court's findings were clearly erroneous or . . . it abused its discretion." *Holt v. Holt*, 458 S.W.3d 806, 812 (Ky. App. 2015).

KRS[1] 456.060(1) permits a court to issue an IPO if, following an evidentiary hearing, the court "finds by a preponderance of the evidence that [domestic] violence and abuse, sexual assault, or stalking has occurred and may [occur] again." The term "stalk" is defined as follows:

(1)(a) To "stalk" means to engage in an intentional course of conduct

    1. Directed at a specific person or persons;

    2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and

    3. Which serves no legitimate purpose.

---

[1] Kentucky Revised Statutes.

(b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

KRS 508.130. Further, KRS 508.150(1) describes second-degree stalking as follows:

(1) A person is guilty of stalking in the second degree when he intentionally:

(a) Stalks another person; and

(b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

1. Sexual contact as defined in KRS 510.010;

2. Physical injury; or

3. Death.

KRS 508.150(1). Angela argues the allegations in Jeffrey's petition and the testimony provided at the hearing do not amount to stalking. We disagree. Jeffrey presented evidence of Angela going to significant lengths to falsify a pregnancy for nine months, repeatedly driving past his house while making noise, following his family in public, contacting his employers, contacting third parties regarding Jeffrey, and contacting Jeffrey himself.

Jeffrey expressed concern that this behavior has persisted for years following the breakup and believes Angela's behavior is a threat to his family. The family court, finding Jeffrey to be a credible witness, drew the conclusion that "the

-6-

course of conduct seriously alarmed, annoyed, intimidated, or harassed Jeffrey; it served no legitimate purpose; and it would cause a reasonable person to suffer substantial mental distress . . . .  Her out-of-control behaviors could easily escalate to cause physical injury or death[.]"  (Record (R.) at 52).  We agree.  Though Jeffrey only vaguely testified as to prior threats made by Angela, we find her cumulative pattern of behavior to implicitly threaten Jeffrey.

As we have previously stated, "implicit" is defined as "capable of being understood from something else though unexpressed . . . ; involved in the nature or essence of something though not revealed, expressed, or developed[.]" *Allen v. Eder*, 682 S.W.3d 32, 37 (Ky. App. 2023) (quoting *Implicit*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (9th ed. 1985)).

Given his prior romantic relationship with Angela and Angela's continued presence at his home and in public, Jeffrey is not required to demonstrate Angela "brandish[ed] a weapon for [him] to conclude that [she] posed a clear and ongoing danger to him." *Id.*  Moreover, Angela explicitly admitted to "pulling up on" Jeffrey.  If our IPO statutes do not protect individuals from the years-long pattern of behavior Angela exhibited, they will have fallen short of their legislative purpose.

"The purpose of an IPO is to protect one who is already a victim from being victimized further as a result of conduct that already points to a dangerous

propensity on the part of a perpetrator." *Id.* Because this alarming behavior easily meets the criteria for the IPO stalking standard, the family court properly entered an IPO based on stalking.

## CONCLUSION

The Nicholas Family Court's Findings, Conclusions, and Order are hereby AFFIRMED.

ALL CONCUR.

BRIEF FOR APPELLANT:                    NO BRIEF FOR APPELLEE.

Hanna L. Stettner
Cynthiana, Kentucky